The 2d and 3d assignments of error are sustained.

The judgment is reversed, and a venire facias de novo awarded.

---

## WILLIAM H. KERN v. LOUIS M. SIMPSON.

ERROR TO THE COURT OF COMMON PLEAS NO. 3 OF PHILA-DELPHIA COUNTY.

Argued April 12, 1889—Decided April 29, 1889.

The case of the plaintiff, in an action for deceit, was to the effect that after an offer of a certain sum in the first mortgage bonds of a telegraph company for a city lot, with a letter showing where inquiry might be made, he afterwards conveyed the lot and accepted the stipulated sum in other bonds, described by printed indorsement as general mortgage bonds, which soon became worthless; in such case, it was not error to direct a judgment of compulsory nonsuit.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and MC-COLLUM, JJ.

No. 257 January Term 1889, Sup. Ct.; court below No. 225 June Term 1886, C. P. No. 3.

On May 21, 1886, William H. Kern brought an action on the case for deceit against Louis M. Simpson.  Issue.

At the trial on November 21, 1888, the plaintiff's case was in substance as follows:

In 1883, William H. Kern, the plaintiff, owned a lot on Spring Garden street in Philadelphia, which he had placed in the hands of Charles F. Hall, a real estate agent, for sale.  In December, 1883, Louis M. Simpson, the defendant, approached Hall on the subject of buying the lot, and on January 7, 1884, he gave to Hall the following offer in writing, to wit:. "$6,000. First mortgage six per cent. Bankers and Merchants Telegraph Company bonds for lot Spring Garden west of Thirty-seventh street, fifty by one hundred and twenty, and back strip.  To be accepted this week. . L. M. SIMPSON, Janu-

ary 7th, 1884." At the same time a letter was given to Hall directing where inquiry could be made respecting the bonds.

The plaintiff testified that he never read this letter. Simpson's offer was accepted and a deed for the property was executed to the defendant, who delivered to the plaintiff six $1,000 bonds of the Bankers and Merchants Telegraph Company. These bonds were part of an issue of $10,000,000 made by the telegraph company and covering their entire property. There was an issue of other bonds, however, known as divisional bonds, issued by companies of the same name, and covering local lines leased by the parent company. These bonds were prior in mortgage lien to the $10,000,000 issue. The bonds accepted by the plaintiff were known on the street and called by the president of the company, general mortgage bonds. The other bonds were known as first mortgage bonds and were sometimes called divisional bonds. The testimony showed that various sales of the general mortgage bonds were made in the spring of 1884 at prices varying from seventy-five to eighty-five per cent. They subsequently became worthless.

The plaintiff testified that about three months after the sale of the lot he went to the defendant's office and said to him: "Mr. Simpson, I have discovered that those are not the bonds that you agreed to give me, and I prefer to have my lot back again; they are not the bonds that I had agreed to take." He says, "I can't give you the lot because I have transferred it. The bonds that you have got are a better bond than the bonds that I was to give you." He says, "Those bonds cover the entire property of the company; the other only covered a portion of the company's property." He says, "I have transferred the property."

Q. Did you ever see him again in relation to this matter? A. The next I saw of Mr. Simpson was at the bank. He and a gentleman, whose name I cannot tell you, called on me to know whether or not I could not negotiate $400,000 of these bonds, and he would make it an interest to me to do so, which I declined to have anything to do with.

Q. About when was it that you went to see Mr. Simpson on the second occasion when you wanted your lot back, and offered to give him back the bonds; was it before or after July of that year? A. Before July.

Q. It was in the spring of that year? A. It was before July because I collected six months' interest after I had the interview with Mr. Simpson. There was one coupon which was paid on these bonds on the first day of July. I think I deposited the coupons, and they were collected in New York.

Q. Has anything ever been paid since? A. No, sir; there has been no value to the bonds, I think, since then. They have been selling at seven or eight cents on the dollar.

Hall, the agent of the plaintiff, though in court was not called, and what was said between him and the defendant in reference to the bonds, did not appear.

At the close of the plaintiff's testimony, on motion of defendant's counsel, a judgment of compulsory nonsuit was entered, the court, GORDON, J., saying:

This is an action on the case for deceit, making certain false and fraudulent representations in connection with the sale of real estate with an intent to defraud the plaintiff. Of course, the gist of such an action is the intent to defraud. As was said by Judge GIBSON in a leading case on the subject, " A constructive deceit is a new thing under the sun." There can be no such thing as a constructive deceit. It is either deceit, or it is not; and if a deceit, the vital element is that of an intention to defraud.

Keeping that principle of law in mind as the ruling principle of this cause, the evidence shows simply this: that the plaintiff had a lot of ground in West Philadelphia to sell; he employed as his agent a person named Hall, who brought to the plaintiff the slip of paper which the plaintiff received. It was signed, apparently, by L. M. Simpson, and was, on its face, a proposition to exchange $6,000 first mortgage bonds of the Bankers and Merchants Telegraph Company for the lot of ground. It is also undoubtedly in evidence that at the same time the plaintiff was given a further communication, which he says he never read, and which also was from the defendant upon the same subject-matter. The plaintiff never had any conversation with the defendant, and there is no testimony in the case of any further declaration, or pretence, or acts by the defendant, from which anything can be inferred or proven as to his intent. The only other instance in which the defendant appeared, was

subsequently, when the plaintiff had executed a deed ready for delivery. Then the defendant comes to the office of the plaintiff, and presents to him the six bonds which are in evidence, which are indorsed in legible characters, and the nature of which is proclaimed by their indorsement. He hands them to the plaintiff, a man of intelligence, who was thereby enabled to advise himself fully of exactly what the bonds were. He received them, and he delivered the deed; and whatever right of action he may have had for deceit culminated then. Up to that point all the acts were done, all the declarations made, which constituted, if they constituted at all, a deceit which was actionable.

I do not see in all this testimony a scintilla of evidence from which an intent to defraud can be found. That which the defendant gave he gave openly. Its character was proclaimed by the indorsement; and this plaintiff was enabled fully to advise himself of everything relating to these bonds. Moreover, there is no evidence of any declaration by the defendant at any time prior, or subsequent, to the delivery of the deed, which shows that he did not believe that those bonds were first mortgage bonds, which, in fact, by the evidence in this case, they were to some extent; because the evidence is that divisional bonds were a first mortgage bond upon certain of the property, and did not cover other of the property, and that the bonds delivered were second mortgage bonds as to some of the property, and first mortgage bonds as to other of the property. We therefore have a case in which there was nothing done by the defendant which could have deceived a person who was put upon his guard at all points as to what he was receiving. As to Mr. Simpson's declaration subsequent to the consummation of this transaction, to my mind it does nothing more than show, taking it to be true in every respect, that he did believe that he was giving this plaintiff a better security than that which the plaintiff thought he ought to receive.

Now, there is an absence of testimony in this case to which a judge cannot close his eyes. Mr. Hall was in court; the person to whom this defendant made every declaration that was made respecting this transaction. He was called at the end of the proceedings yesterday and was withdrawn from the stand. Presumably he is in court now. He was the agent of this

plaintiff.   There is no evidence that he was the agent of the defendant.   He has full knowledge of anything which the defendant said.   He is not called.   The presumption, therefore, is that nothing was said by the defendant to this agent which would show an intent to defraud.   On the other hand, the legal presumption is, that if there were any declarations made, they were such as would have shown the entire integrity of the defendant's conduct.

I may also say that I do not see any proof of damage in this case.   There is no competent proof to show that these bonds, at the time they were delivered, were not worth as much as what are termed the first mortgage bonds.

A rule to show cause why the judgment of nonsuit should not be vacated was subsequently discharged, when the plaintiff took this writ, assigning as errors the entry of the judgment and the discharge of the rule to show cause why it should not be vacated.

*Mr. Hood Gilpin* (with him *Mr. Leonard R. Fletcher*), for the plaintiff in error.

*Mr. Robert H. McGrath* and *Messrs. Crawford* and *Dallas*, for the defendant in error.

PER CURIAM:

The reasons given by the learned judge of the court below for entering a nonsuit in this case are so satisfactory that a discussion of the subject here is unnecessary.

                                        Judgment affirmed.